In the Matter of the Estate of KEITH B. ANGELL, Deceased. BILLIE B. ANGELL, Individually and as Coexecutor and Cotrustee under the Will of KEITH B. ANGELL, Deceased, et al., Respondents; NATIONAL BANK AND TRUST COMPANY OF NORWICH, Appellant.

Third Department, November 15, 1944.

*Hiscock, Cowie, Bruce, Lee & Mawhinney,* attorneys (*Donald M. Mawhinney* of counsel), for appellant.

*Hancock, Dorr, Ryan & Shove,* attorneys (*B. E. Shove* and *L. C. Ryan* of counsel), for respondents.

*Janet W. Hill,* special guardian for Jerry B. Angell, an infant.

Foster, J.  Keith B. Angell died December 6, 1938, survived by his widow, the respondent, and by his infant son, Jerry B. Angell, now sixteen years of age.  By his will decedent left his entire residuary estate in trust for the support of respondent, and upon her death to his son.  Respondent and the National Bank and Trust Company of Norwich, New York (hereafter called the Bank), were named as trustees, and given the right to invade the principal of the trust, if necessary, for the support and maintenance of respondent in the style to which she had been accustomed.  Respondent has remarried and is now the wife of James W. Coleman, an attorney, and at present an officer in the United States Army.  The sole assets of the trust estate are 640 shares of the capital stock of B. F. Gladding & Co., Inc.

There have been difficulties between the respondent and her cotrustee, and by order of the Surrogate's Court the Bank has been removed, and respondent has been authorized to act as sole trustee.  From this order the Bank has appealed, and it seeks also to review on this appeal an order appointing a special guardian in the proceeding for the infant remainderman.

Since the trust itself and the difficulties between respondent and the Bank are directly connected with the affairs of the Gladding Company, some factual background of the company's business, its directors and stockholders is necessary to make a decision intelligible.  Up until the war made a change imperative this company manufactured fish lines at a plant in the small hamlet of South Otselic, Chenango County, N. Y., and had been in that business for many years, in fact the business was founded in 1816.  At present it makes parachute rip cords for the United States Government.  Of course its present business is only temporary and everyone concerned assumes that after the war it will return to the manufacture of fish lines, in which it had been so highly successful that its products were known and sold throughout the United States and in many foreign countries.

There are at present 3200 outstanding shares of capital stock of the company.  During its many years of existence the operation of the company has been almost exclusively a family affair and the infant remainderman is a descendant of its founder. The business was founded in 1816 by John Gladding.  He was succeeded by James Gladding, who in turn was succeeded by B. F. Gladding.  After the latter came Ralph Brown, a nephew of B. F. Gladding and a grandson of James Gladding.  Under the administration of Brown the business was incorporated in 1916, and he became its majority stockholder and executive head,

and continued in that capacity until his death in 1928. During that period there was associated with him Earl J. Angell, who had married his daughter, Jessie Brown. After Brown's death Earl J. Angell became the owner of a majority of the stock of the corporation and its executive head. He died in 1936, survived by his widow, Jessie B. Angell, and two sons, Keith B. Angell and Murray B. Angell. At the time of his death he owned 1602 shares of stock in the company. After his death Murray B. Angell ultimately became the owner of 900 shares, partly from the fulfillment of trust provisions in his father's will and from other sources. Keith B. Angell also became the owner of 900 shares, partly as the result of trust provisions in his father's will, and from other sources. The widow, Jessie B. Angell, was and is the owner of 50 shares. The details of the trust provisions mentioned are immaterial. Suffice it to say that the total family holdings amounted to 1850 shares.

It does not appear from the record that Murray B. Angell took any important part in the operation of the business either before or after the death of his father, but his brother, Keith B. Angell, upon the death of the father, became president of the corporation and continued in charge thereof until his death on December 6, 1938. He married respondent in 1927, and their only child, Jerry, was born July 22, 1928. At the time of his death he still owned 900 shares in the corporation. By his will the decedent granted to his brother, Murray B. Angell, the first right to purchase from his estate any and all of this stock if it was the desire of his executors and trustees to dispose of the same. After disposing of some miscellaneous personal property he left his entire residuary estate, which apparently consisted of the 900 shares of stock mentioned, in trust to respondent, his widow, and the Bank, as trustees to pay the income thereof to respondent during the remainder of her life, with the right to invade the principal as heretofore indicated, and upon her death the principal of the trust remaining was to be divided into as many separate trusts as there were surviving children. Since Jerry B. Angell was the only surviving child he became the sole remainderman.

The corpus of the estate was depleted by the sale of 260 shares to respondent. She alleges that this was necessary to liquidate the indebtedness of the decedent, to pay taxes and administration expenses, and that she purchased from the estate this number of shares at a price of $125 a share for a total of $32,500. The sale of this block of stock left 640 shares in the trust and at that figure it now remains.

At the time this proceeding was instituted, and aside from the stock in the trust fund, there were two factions among the stockholders of the company. One thousand three hundred and fifty shares were owned as follows: Nina B. Breslove, 300 shares; Dorothy Stack (daughter of Nina B. Breslove), 100 shares; S. Howard Fyler, 200 shares; Syracuse Trust Company, as trustee under agreement with Fyler, 200 shares; Audley R. Dutton, 400 shares, and Francis B. Angell, 150 shares. These stockholders combined to pool their interests in a voting trust agreement. It is stated that this procedure was taken to protect their interests against possible control of the corporation by respondent; and on the ground that if she should gain control it would be disastrous to the business of the corporation and destructive to the value of its stock. Of these stockholders Mrs. Breslove and her daughter are descendants of John Brown; Francis B. Angell is a brother of Earl J. Angell; and the others are men who have been associated with the business for many years.

The other group or faction of stockholders, aside from the trust, are Jessie B. Angell, owner of 50 shares; Murray B. Angell, owner of 900 shares; and respondent, owner of 260 shares, or a total of 1,210 shares. The respondent claims that the voting trust agreement was formed to oppose the interests of the Earl J. Angell family, and that if the minority group obtained control the trust estate would be jeopardized.

With this factional division of stock ownership the 640 shares in the trust estate holds the balance of power. The cotrustees were not in agreement as to how the stock in the trust estate should be voted in a meeting for the election of directors, and respondent thereupon petitioned the Surrogate's Court, under section 48 of the Stock Corporation Law, for an order directing that such stock should be voted for certain nominees, among others herself. She was joined in this petition by Jessie B. Angell and Murray B. Angell.

The Bank as cotrustee filed an answer opposing the petition, and asserting that there was no justification whatever for the removal of any members then serving on the board of directors. It also alleged that respondent had been a disrupting influence in her connections with the company; that she desired to dominate the business and intended to do so through a majority of her nominees on the board of directors; and that if she obtained control it would not be for the best interests of the company. The Bank also suggested that the infant remainderman should be represented by a special guardian in the proceeding.

Along with its answer the Bank filed a cross petition in which it charged respondent with persistent efforts to use her trust position as cotrustee to dominate and control the corporation and to obtain for herself a substantial salary as an official thereof. It recited at length alleged acts of the respondent which it claimed indicated her intent to dominate and control the affairs of the corporation, and again asserted its belief that she had neither the experience nor ability to justify such control, and that if she obtained it there would be a disastrous effect upon the business of the corporation which would in turn affect the value of the stock and therefore injure the trust estate. It further alleged that her attempts to secure domination had already split the stockholders outside of the estate into two bitterly opposed factions, and caused the creation of a voting trust among certain minority stockholders. In view of this situation the Bank suggested that the best interests of the trust estate required that it be converted to a more stable investment. It cited an offer of $200 a share for the stock, and recommended that the stock be sold under a procedure allowing for free competition between the opposing interests.

Respondent filed a reply to the answer and petition of the Bank, and a cross petition demanding the removal of the Bank as cotrustee. In these pleadings she denied the allegations of the Bank as to her conduct; and she charged the Bank with a failure to co-operate with her in the administration of the trust; that it had secretly conferred with and negotiated with factions adverse to the interests of the estate; that it encouraged the formation of the voting trust among minority stockholders; that a director of the Bank was one of the voting trustees thereof; and that generally it was hostile to her without justification. To this pleading the Bank filed a surreply, denying generally the charges made by respondent, and alleging in extenso its own charges against her, many of which have already been covered.

It is impractical and unnecessary in this opinion to attempt to set forth in greater detail the charges and counter charges alleged in the pleadings. They are set forth sketchily merely because the Surrogate made his decision without a hearing at which testimony was taken, and solely upon the pleadings, affidavits and the report of the special guardian. Such testimony as was taken related only to the qualifications of the special guardian. Many of the charges and counter charges are based upon alleged acts, conversations, letters, meetings and other episodes, some of which are in dispute, and from nearly all of

which varying inferences as to motives are sought to be drawn. It would be fruitless to attempt to discuss them for the truth as to motives cannot be found with any semblance of accuracy from such a record.

The Surrogate found in his decision that the controversy over how the trust stock should be voted resulted from the desire of respondent to vote such stock for directors who would be subservient to herself, her mother-in-law and brother-in-law; and that contra, the desire of the Bank was to vote the stock for directors who would be subservient to the stockholders combined in the voting trust. Neither party admits this impeachment of their motives, and it seems doubtful that such conclusions can be drawn with any certainty from the pleadings alone. Both parties insist that it was not a matter of subservient directors, or control of the corporation merely for the sake of control, that dictated their conduct, but rather a selection of directors who would best serve the interests of the corporation, and hence the trust estate. And from the record as it stands we think it may well have been found that such were their motives, however divergent their views as to the methods to be employed.

However that may be the Surrogate was on firm ground when he held that the differences of opinion between the trustees were so intensive that future co-operation is improbable. The pleadings and supporting data are certainly sufficient to establish this as a fact, and this alone is enough to justify the removal of one or both trustees. (*Quackenboss* v. *Southwick*, 41 N. Y. 117; *Disbrow* v. *Disbrow*, 46 App. Div. 111.)

The decision went beyond this and decided charges of a more serious nature upon support too slender to serve as a basis for a finding. We mention one. It asserted that the real objection to the sale of trust stock, as proposed by the Bank, we assume, is that its purpose is to pillage the assets of the company and destroy the value of the stock owned personally by respondent and others. If this impugnment of motives was really meant to apply to the Bank the record is wholly insufficient to sustain it.

The decision also condemned the voting trust agreement and what it terms the evils of management. As to the voting trust we cannot say whether the motives that inspired it were malignant or otherwise, nor do we think it essential to determine such a matter on this appeal. The only specific instance of evil management cited is the bonus given to the superintendent during his first two years with the company. This may have been a mistake, but if so the responsibility therefor was not that of

the Bank alone. The decision concluded that the removal of respondent would reinstate the evils of management; that nothing beneficial had been accomplished by the Bank as trustee, and that there was no reason for its continuation as such. Respondent was directed to take over the sole trusteeship.

We view the situation, in part at least, somewhat differently. Obviously if the corporate stock is to remain the corpus of the trust fund, the future welfare of the corporation bears directly upon the integrity of the trust. Much has been said upon the subject of family control, and the legitimate aspirations of the young remainderman to continue in the business of his forbears. This of course has its appeal but the real essence of the trustees' duty is the preservation of the trust. There is nothing in the will of decedent to indicate any intention on his part that respondent and their son should continue in the business. He gave his trustees discretion to invest the trust fund in any securities they deemed satisfactory and for the best interests of the estate.

However, the record of the Gladding Company for many years past is such as to indicate that for the purposes of the trust, as set forth by the testator, its stock is an excellent investment, and will continue to be so provided the company has fair management. On that basis we agree with the Surrogate that it should not be sold if there is any prospect of fair management. All agree that the company is now in excellent condition and the entire controversy over control seems to center about the future. At present two substantial groups of stockholders are bitterly divided, and who should have control has become a serious question and of vital interest to the trust. To give the sole trusteeship of the trust to respondent will place her and her brother-in-law in complete control of the company through the medium of a directorate elected by them, and certainly this will not tend to harmonize relations between the stockholders. Whether either of them is fitted by experience or ability for such responsibility we cannot say. Ordinarily this would be no concern of ours, for those who have the greatest interests in a company have the undoubted right to control it. Here, however, the stock which holds the balance of power is not owned absolutely by respondent. While she is the primary beneficiary, entitled first to the income therefrom, with the right to invade the principal if that is necessary to support her in the style to which she has been accustomed, nevertheless as a trustee she has the duty to maintain the integrity of the fund insofar as it is possible to do so within the terms of the will.

The duality of her interests would make the role of a sole trustee a delicate and difficult one for her to carry with absolute fidelity to the trust, especially in view of her apparent confidence in her own ability and the distrust evinced against her by a very substantial group of stockholders. One solution, of course, would be to remove her also as a trustee, and appoint substitute trustees who would be complete strangers to the existing factional strife. We are loath however to remove one who is not only the primary beneficiary of the trust but also the mother of the infant remainderman. It is generally the policy of the law to prefer a beneficiary. (*Disbrow* v. *Disbrow,* 46 App. Div. 111, *supra; Crummey* v. *Murray,* 130 Misc. 378.) Moreover we can conceive of no possible motive for respondent to mismanage the trust so as to impair her own income and perhaps destroy the inheritance of her only son. But since the preservation of the fund is so closely related to control of the company we think the best interests of the estate and its beneficiaries would be served by a fresh and unbiased viewpoint, unhampered and unembarrassed by family ties or ambitions, and free from factional influences among the stockholders; and to that end a cotrustee should be appointed in place of the Bank.

We see no reason to review the discretion of the Surrogate in the appointment of the special guardian; and moreover it is highly questionable whether under the circumstances disclosed the bank had a right to appeal as an aggrieved party from the order of appointment. While we may not have agreed with all the conclusions of the special guardian we think she was not disqualified from acting; that her appointment was properly made, and that she rendered an able and informative report for the protection of what she conceived to be the best interests of her ward. More could not be expected from any special guardian and often less is found.

The appeal from the order appointing the special guardian should be dismissed, without costs. The decree of the Surrogate should be affirmed insofar as it directs the removal of the Bank as a trustee upon the ground of lack of harmony with the respondent as its cotrustee, and should be affirmed insofar as it fixes compensation for the services of the special guardian; and should be modified on the law insofar as it directs respondent to continue as sole trustee, and it is directed that a substituted cotrustee be appointed in place and stead of the appellant Bank. The proceedings should be remitted to the Surrogate's Court of Chenango County for appropriate action in conformity with the foregoing.

All parties filing briefs should be awarded costs and disbursements on appeal, payable out of the estate.

All concur.

Appeal from the order appointing special guardian dismissed, without costs.

Decree appealed from is affirmed insofar as it directs the removal of the National Bank and Trust Company of Norwich as trustee upon the ground of lack of harmony with the respondent, its cotrustee, and also affirmed insofar as it fixes compensation for the services of the special guardian; and is modified on the law insofar as it directs respondent to continue as sole trustee, and it is directed that a substituted cotrustee be appointed in place and stead of the appellant Bank. The proceedings are remitted to the Surrogate's Court of Chenango County for appropriate action in conformity with this decision. All parties filing briefs are awarded costs and disbursements on appeal, payable out of the estate.